[Civ. No. 31852.   Second Dist., Div. Three.   Jan. 22, 1969.]

GORDON GORDON et al., Plaintiffs and Respondents, v. WARNER BROS. PICTURES, INC., Defendant and Appellant.

Wyman, Bautzer, Finell & Rothman, Mitchell, Silberberg & Knupp, Ralph E. Lewis, Charles A. Collier and Charles L. Fonarow for Defendant and Appellant.

George F. Wasson, Jr., for Plaintiffs and Respondents.

MOSS, J.—Defendant appeals from a judgment after a jury verdict in the amount of $54,800 in favor of plaintiffs in an action for money damages for the wrongful use by defendant of the title "The FBI Story" in a motion picture produced by defendant.

The motion picture, released in 1959, was based upon a book written by Don Whitehead and first published on November 28, 1956, under the title "The FBI Story" and the subtitle "A Report to the People." The book became a best seller, was selected by the Book-of-the-Month Club, became a Reader's Digest condensed book and was published serially by many newspapers. It was also published in a paperback edition. Over 4,000,000 copies of the book were sold in addition to those which appeared in serial form in newspapers having a circulation of over 12 million copies. Defendant purchased the motion picture rights to the Whitehead book two days after its first publication. The Whitehead book is a nonfiction study of the Federal Bureau of Investigation with an account of many cases and events that have figured prominently in the history of that organization.

Plaintiffs are the authors of a novel entitled "FBI Story," first published in 1950. Three hundred and ninety thousand copies of plaintiffs' book were sold prior to release of defendant's film. Plaintiffs' book is a fictitious story of how an FBI special agent, John Ripley, nicknamed "Rip," investigates and solves a single case. Rip is engaged to Lorrie, who appears briefly a few times in the novel. Both books were copyrighted.

Defendant's motion picture, entitled "The FBI Story," presents the FBI, its history and procedures and many of its actual cases, dramatized for picture purposes through the use of a fictitious typical special agent called John M. Hardesty, nicknamed "Chip," played by actor James Stewart. It presents the actual cases as though the agent had participated in most or all of the incidents. The story depicts the impact of the duties of a special agent on himself and his wife Lucy.

When plaintiffs learned of the impending publication of the Whitehead book, they wrote to the publisher protesting the use of the title incorporating the words, the "FBI Story," on the ground that the words had acquired a secondary meaning as the title of plaintiffs' novel. The publisher denied the existence of any secondary meaning, especially in view of the

fact that another book entitled "The Story of the F.B.I." had been published in 1947, and asserted that there could be no confusion because the Whitehead book would be subtitled "A Report to the People," would have a substantially different format from plaintiffs' book and would be "the actual story of the F.B.I." rather than a novel. Plaintiffs took no further steps to stop the publication of the Whitehead book.

At about the same time that defendant purchased the motion picture rights in the Whitehead book plaintiffs granted an option to Gramercy Pictures, Inc., to purchase the motion picture rights in their novel. Within a month Gramercy filed a registration of the title "The F.B.I. Story" with the Motion Picture Association of America, Inc., in accordance with the industry title practice. About a week later defendant also filed a registration of the same title with the association, and after an arbitration the board of directors of the association decided that defendant was entitled to use the title.

As part of its advertising program for the motion picture defendant prepared and issued to its potential exhibitors a press book which contained samples of advertisements which would be available for purchase by the theaters showing the film and suggested publicity stories. On the first page of the press book in a box captioned "The Credits" appears "From the Book by DON WHITEHEAD." Some of the advertising cuts in the book specifically mentioned Don Whitehead, but several cuts contained the inscription, "The story that smashed best-selling records! More than 17,000,000 have thrilled to it here and abroad." The press releases issued by defendant to publicize the film usually mentioned Whitehead by name as the author of the book from which the film derived.

Five witnesses testified for plaintiffs that they had read plaintiffs' book and that they had gone to see defendant's film believing, because of the advertisements which they had seen and because of the title, that the film was based upon plaintiffs' novel. Of these five persons three were personally acquainted with plaintiffs and one had obtained the book from a friend of plaintiffs. None of these witnesses had read Whitehead's book.

Plaintiffs have never contended that defendant's motion picture borrowed anything from their book other than its title. While plaintiffs note the similarity in the nicknames of the special agents and in the names of their respective ladies, they do not claim that this similarity entitles their characters

to copyright protection, as indeed they could not. (See *Columbia Broadcasting System, Inc.* v. *DeCosta* (1st Cir. 1967) 377 F.2d 315, 317-318; Nimmer on Copyright (1968) § 30, pp. 134.1 et seq.) Plaintiffs also recognize that they cannot claim copyright protection for their title. (*Jackson* v. *Universal Intl. Pictures, Inc.*, 36 Cal.2d 116, 121 [222 P.2d 433] ; Nimmer, *supra,* § 34, p. 140 ; see Netterville and Hirsch, *Piracy and Privilege in Literary Titles,* 32 So. Cal. L.Rev. 101, 109.) Therefore, their claim against defendant must rest upon the theory of unfair competition.

A *sine qua non* of protection of titles on a theory of unfair competition is the establishment by the plaintiff of a secondary meaning in his title.[1] (*Jackson* v. *Universal Intl. Pictures, Inc., supra,* 36 Cal.2d 116, 121; *Cowles Magazines & Broadcasting, Inc.* v. *Elysium, Inc.,* 255 Cal.App.2d 731, 733 [63 Cal.Rptr. 507] ; see Nims, The Law of Unfair Competition and Trade-Marks (4th ed. 1947) § 274a, p. 894; Nimmer, *supra,* § 34 at pp. 141-142; Restatement of Torts (1938) § 716.)

According to Nims, *supra,* § 37 at p. 154, one of the best known and most accurate summaries of the secondary meaning rule is as follows: ''Primarily, it would seem that one might appropriate to himself for his goods any word or phrase that he chose; but this is not so, because the broader public right prevails, and one may not appropriate to his own

[1]In *Johnston* v. *Twentieth Century-Fox Film Corp.,* 82 Cal.App.2d 796, 808 [187 P.2d 474], the court stated at one point that an author may have a property in and the exclusive use of a fanciful title on the theory, apparently, that a nondescriptive title is entitled to protection as a trademark. This statement was unnecessary to the holding since the title which was the subject of that case, ''Queen of the Flat Tops,'' had been found to have acquired a secondary meaning. (82 Cal.App.2d at p. 813.) To the extent that *Johnston* implies that an author may have an inherent right in the title to his work where the title has not acquired a secondary meaning, it does not reflect the law of this state (*Jackson* v. *Universal Intl. Pictures, Inc., supra,* 36 Cal.2d 116, 121) and general authority on the subject (See Nimmer, *supra,* 34, p. 140; Netterville and Hirsch, *supra,* 32 So. Cal.L.Rev. at pp. 110-111, 114, 139-141.) *Metro-Goldwyn-Mayer, Inc.* v. *Lee,* 212 Cal.App.2d 23 [27 Cal.Rptr. 833], does not reach a contrary result. There plaintiffs originated and advertised the phrase ''The Wonderful World of the Brothers Grimm'' as the title for their forthcoming motion picture. An injunction against defendant's use of the same phrase to advertise his film was sustained. In answer to the defendant's assertion that plaintiffs' title was not entitled to protection because it had not yet been ''used'' and therefore had not acquired a secondary meaning, the court pointed out that it was not protecting plaintiffs' title as such, but protecting them against deceptive advertising.

exclusive use a word which already belongs to the public . . . [The theory of secondary meaning] contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, 'secondary meaning,' seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning." (*G. & C. Merriam Co.* v. *Saalfield* (6th Cir. 1912) 198 F. 369, 373.) The California Supreme Court has stated the rule as follows: " 'If plaintiff proves that the name or word has been so exclusively identified with his goods or business as to have acquired a secondary meaning, so as to indicate his goods or business *and his alone,* he is entitled to relief against another's deceptive use of such terms, but if he fails in such proof, he is not entitled to relief.' " (Italics added.) (*Academy of Motion Picture Arts & Sciences* v. *Benson,* 15 Cal.2d 685, 690 [104 P.2d 650]; *Cowles Magazines & Broadcasting, Inc.* v. *Elysium, Inc., supra,* 255 Cal.App.2d at p. 735.) The Restatement of Torts, *supra,* § 717, comment (f), states, "A designation is a trade name only if, apart from other requirements, it has acquired a special significance as the name of the goods, services or business of *one person.* Until the designation has acquired this special significance, it is not protected as a trade name. Acquisition of this special significance, rather than priority of use, is, therefore, a necessary condition of protection against infringement of a trade name." (Italics added.) It can be seen from the foregoing statements of the rule of secondary meaning that a plaintiff "must show that his mark means him, else he cannot prevent others from using it." (L. Hand, J.) (*Bayer Co.* v. *United Drug Co.* (S.D. N.Y. 1921) 272 F. 505, 513.)

The trial court refused an instruction offered by defendant[2] which included a definition of secondary meaning

[2]"By the term 'secondary meaning' the law means that a particular word or phrase has become so exclusively identified with a particular article or work as to have achieved a trade significance as indicating that article or work and that alone. A title to have a secondary significance

in accord with the law as stated above and on its motion gave the following definition to the jury: "By a 'secondary meaning' is meant that the author's title has achieved recognition as associated or identified with his literary property in the minds of a substantial number of the public." The vice of this definition lies in the use of the phrase, "as associated or identified with." "Associated with" means "closely connected." (Webster's Third International Dictionary, G. & C. Merriam Co., 1964 ed.) "Identified with" has a similar meaning. (See Fowler, Modern English Usage (2d ed) p. 260.) To say that the title "FBI Story" is closely connected with plaintiffs' book in the minds of a substantial number of the public is not the same thing as to say that the title has been so exclusively identified with plaintiffs' book so as to indicate their book, and theirs alone, since, as this case illustrates, it is possible to say that the title "FBI Story" was closely connected in the minds of a substantial number of people with both plaintiffs' and Whitehead's book.[3] The error in the instruction given was aggravated by the failure of the court to instruct the jury, as requested by defendant, that "mere priority of use does not create or establish a secondary meaning for a title." The proposed instruction is a correct statement of the law (*Family Record Plan, Inc.* v. *Mitchell,* 172 Cal.App.2d 235, 243 [342 P.2d 10]; Restatement of Torts, *supra,* § 717, com. (f)), and the court's failure to give it gave rise to the possibility that the jury could find that plaintiffs' title had acquired a secondary meaning as the name of their book by reason of the fact that their book was published first even though the jury also found that the title was also closely connected in the minds of a substantial number of

or meaning must be one that is identified in the public mind with the plaintiffs to such an extent that the title has become well known, and the work bearing that title is at once recognized as the plaintiffs' work." The second sentence of the foregoing definition does not accurately state the law: the requirement that a title be well known is a generality that adds nothing to the previous sentence; the requirement that a title be "at once" recognized finds no support in the authorities.

[3]In *Curtis* v. *Twentieth Century-Fox Film Corp.*, 140 Cal.App.2d 461, 468 [295 P.2d 62], this court approved as correct an instruction that to find unfair competition the jury must first find "[t]hat plaintiff's book has become identified in a significant portion of the public mind by the title 'You're in the Navy Now.'" The use of "identified . . . by" in this instruction was correct since that term used in this way means to cause to become identical or the same (Webster's, *supra*) whereas, as explained above, the use of the term "identified . . . with" connotes a looser connection.

people with Whitehead's book. In view of the fact that Whitehead's book was shown to have achieved considerably wider circulation than plaintiffs' book before the release of defendant's motion picture, the probability that the jury was misled by the errors in the instructions is substantial, and, therefore, the errors were prejudicial.

Our conclusion is not altered by the fact that the court also instructed the jury properly, as we explain hereafter, that a condition of defendant's liability was a finding that defendant used the title ''The FBI Story'' with the intent to deceive the public into believing that its film was connected with plaintiffs' book. There was no evidence from which the jury could infer an intent on the part of defendant to deceive other than its use of the title ''The FBI Story'' and defendant's failure to include in some of its advertisements a mention of Whitehead's name as the author of the book upon which the film was based. However, if the title had no secondary meaning as referring exclusively to plaintiffs' book, defendant had a right to use that title and an intent to deceive could not be inferred from the fact that defendant used it. As Nims says, ''Unless [secondary meaning] be proved the defendants are not in the wrong, for they are merely using a name to which they have as much right as has the plaintiff, and there is no room for a charge of fraud or unfairness.'' (Nims, *supra*, § 37, at p. 157.)

Defendant contends that it was entitled to judgment as a matter of law because under the decisions of the United States Supreme Court in *Sears, Roebuck & Co.* v. *Stiffel Co.* (1964) 376 U.S. 225 [11 L.Ed.2d 661, 84 S.Ct. 784], rehearing denied (1964) 376 U.S. 973 [12 L.Ed.2d 87, 84 S.Ct. 1131], and *Compco Corp.* v. *Day-Brite Lighting, Inc.* (1964) 376 U.S. 234 [11 L.Ed.2d 669, 84 S.Ct. 779], rehearing denied (1964) 377 U.S. 913 [12 L.Ed.2d 183, 84 S.Ct. 1162], even if it were proved that the title of the motion picture was actually copied from plaintiffs' book, the court had no power to award damages for such copying. Defendant argues that plaintiffs' title is not protected by copyright and, therefore that the doctrine of *Sears* and *Compco* as expressed in the following language in those cases precludes protection under a theory of unfair competition: '' [W]hen an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Article I, § 8, cl. 8, of the Constitution

and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." (*Compco Corp.* v. *Day-Brite Lighting, Inc., supra,* 376 U.S. at p. 237 [11 L.Ed.2d at p. 672].) "Just as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws." (*Sears, Roebuck & Co.* v. *Stiffel Co., supra,* 376 U.S. at p. 231 [11 L.Ed.2d at p. 667].) We need not examine in detail the preemptive effect of *Sears* and *Compco* on the law of unfair competition as applied to titles because in this case, if plaintiffs are entitled to damages at all, they must necessarily prove facts that would place this case within an express exception to the rule of federal preemption laid down in those cases. In *Compco,* the court stated the exception as follows: "A State of course has power to impose liability upon those who, knowing that the public is relying upon an original manufacturer's reputation for quality and integrity, deceive the public by palming off their copies as the original." (376 U.S. at p. 238 [11 L.Ed.2d at p. 672].) ▮ Although in an action for injunctive relief against unfair competition it is unnecessary to prove that the defendant's conduct was fraudulent (Civ. Code, § 3369; *Brooks Bros.* v. *Brooks Clothing of Cal.* (S.D. Cal. 1945) 60 F.Supp. 442, 454-456, aff'd. 158 F.2d 798, cert. denied 331 U.S. 824 [91 L.Ed. 1840, 67 S.Ct. 1315]; *Family Record Plan, Inc.* v. *Mitchell, supra,* 172 Cal.App.2d 235, 245) such proof is required to establish a claim for damages. (*Wood* v. *Peffer,* 55 Cal.App.2d 116, 125-126 [130 P.2d 220] [no accounting for profits in absence of intent to deceive]; *Ball* v. *United Artists Corp.,* 13 App.Div.2d 133 [214 N.Y.S.2d 219, 226]; Restatement of Torts, *supra,* § 745, com. (b); Callmann, The Law of Unfair Competition and Trade-Marks (2d ed.) § 89.2(a), p. 1868; see *Karsh* v. *Haiden,* 120 Cal.App.2d 75, 85 [260 P.2d 633]; *Doran* v. *Sunset House Distributing Corp.* (S.D. Cal. 1961) 197 F.Supp. 940, 948-949, aff'd. 304 F.2d 251.) ▮ Upon a retrial in order to recover damages, plaintiffs must prove as an essential element of their cause of action that defendant copied the title "The FBI Story" from plaintiffs with the intent to deceive the

public into believing that its motion picture was based upon or connected with plaintiffs' book. *Sears* and *Compco* expressly do not preclude recovery upon such a showing.

The judgment is reversed.

Ford, P. J., and Cobey, J., concurred.

A petition for a rehearing was denied February 11, 1969, and respondents' petition for a hearing by the Supreme Court was denied March 19, 1969. Burke, J., did not participate therein.